# In the United States Court of Federal Claims

No.  12-125C
(Filed:  February 6, 2013)

| | |
|---|---|
| JAMES H. WOLLMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

10 U.S.C. §1201 (2006) and 37 U.S.C. § 204(a)(2006); Military Disability Retirement; Existed Prior to Service, "EPTS"; Presumption of Incurrence and Aggravation; 28 U.S.C. § 1491(a)(2), Remand.

*Jason Ellis Perry*, Cheshire, CT, for plaintiff.

*Michael Damien Snyder*, U.S. Department of Justice, Washington, DC, with whom were *Stuart Delery,* Principal Deputy Assistant Attorney General, and *Jeanne E. Davidson*, Director, for defendant.  *Captain Rachel A. Landsee*, U.S. Army Litigation Division, Fort Belvoir, VA, of counsel.

**O P I N I O N**

**FIRESTONE**, *Judge*

In this military pay case, Mr. James H. Wollman ("Mr. Wollman" or "the

plaintiff") seeks compensation and benefits under 10 U.S.C. § 1201 (2006) and 37 U.S.C.

§ 204(a) (2006) stemming from the Army Physical Disability Review Board's

("APDRB")[1] failure to correct what he alleges was the United States Army Physical

Disability Agency's ("USAPDA") (1) denial of a full and fair hearing under 10 U.S.C. §

---

[1] Like the Army Board of Corrections for Military Records, the APDRB was established pursuant to 10 U.S.C. §§ 1552, 1554, and possesses the same powers as those exercised by the boards whose decisions it reviews.  See 32 C.F.R. § 581.1(a) (2006).

1214 (2006); (2) failure to properly apply certain presumptions related to whether his Ankylosing Spondylitis ("AS")[2] was incurred and aggravated while serving on active duty; and (3) refusal to properly compensate him in light of his AS, plantar fasciitis, and wrist fracture.  In his pending cross motion for judgment on the administrative record, Mr. Wollman seeks compensation for denied pay and allowances; out-of-pocket expenses for medical care incurred since his separation from active duty; restoration to active duty until his case is finally decided by the Secretary of the Army (in the event that the court remands the case for further proceedings); and costs and attorneys fees.

The defendant, the United States ("the defendant or "the government"), has moved for judgment on the administrative record, arguing that the APDRB's decisions were not arbitrary, capricious, unsupported by substantial evidence, or contrary to law. Specifically, the government contends that (1) any procedural errors made by the Medical Evaluation Board ("MEB"), Physical Evaluation Board ("PEB"), or USAPDA were corrected by the APDRB; (2) the PEB, USAPDA, and the APDRB properly applied the presumptions concerning the incurrence and aggravation of Mr. Wollman's AS; (3) substantial evidence supported the PEB, USAPDA, and APDRB findings concerning the incurrence and progression of Mr. Wollman's AS; and (4) the plaintiff waived his disability claims related to his plantar fasciitis and wrist fracture.

---

[2] Ankylosing Spondylitis is "a form of degenerative joint disease that affects the spine.  It is a systemic illness of unknown etiology, affecting young persons predominantly, and producing pain and stiffness as a result of inflammation of the sacroiliac, intervertebral, and costovertebral joints. . . ." Dorland's Illustrated Medical Dictionary, 1779 (31st ed. 2007).

For the reasons discussed below, the government's motion for judgment on the administrative record is **GRANTED-IN-PART AND DENIED-IN-PART**, and the plaintiff's motion for judgment on the administrative record is **DENIED-IN-PART**.  The case is **REMANDED** to the APDRB for further proceedings consistent with this opinion.

## I.   BACKGROUND

### A.  The Relevant Statutory and Regulatory Provisions

Under 10 U.S.C. Chapter 61, a member of the armed services may be entitled to disability benefits if, <u>inter</u> <u>alia</u>, the member incurs or aggravates[3] a physical disability in the line of duty.  <u>See</u> 10 U.S.C. § 1201.  The Departments of Defense ("DoD") and the Army have implemented Chapter 61 through complementary regulatory frameworks. DoD Instruction ("DoDI") 1332.38 (November 1996) establishes the Disability Evaluation System ("DES"), which consists of department-wide policies and procedures for adjudicating claims for disability retirement and severance pay.  The DES process generally includes evaluation(s) by a MEB; physical disability evaluation(s) by Informal and/or Formal PEBs; service member counseling; and a final disposition regarding continued service.  DoDI 1332.38 ¶ E3.P1 <u>et</u> <u>seq</u>.

The Army has issued tailoring regulations which provide more detailed procedures to adjudicate disability claims.  <u>See</u> Army Regulation ("Army Reg.") 635-40 (September

---

[3] DoDI 1332.38 defines "Service Aggravation" as "[t]he permanent worsening of a pre-[s]ervice medical condition over and above the natural progression of the condition caused by trauma or the nature of [m]ilitary [s]ervice."

1, 1990) (Physical Evaluation for Retention, Retirement, or Separation);[4] Slesinski v.

United States, 34 Fed. Cl. 159, 162-63 (1995) (describing the Army's disability

evaluation process under Army Reg. 635-40).  See generally Army Reg. 600-8-4 (April

2004) (Line of Duty Policy, Procedures, and Investigations);[5] Army Reg. 40-501

(February 2005) (Standards of Military Fitness).  Of particular relevance to Mr.

Wollman's claims, Army Reg. 635-40 dictates how the Army determines whether a

soldier's medical condition existed prior to service ("EPTS")[6] or was permanently

aggravated by service.  Specifically, when determining whether a condition was incurred

or aggravated in the line of duty, DoDI 1332.38 and Army Reg. 635-40 create certain

presumptions based on the nature of the condition and when it was discovered.  As

---

[4] The court concludes that the September 1, 1990 update to the August 15, 1990 release of Army Reg. 635-40 was the operative regulation at the time Mr. Wollman was separated from the Army. The government cites to Army Reg. 635-40 (August 1990), and the plaintiff cites to a February 8, 2006, update to Army Reg. 635-40.  The effective date of the February 2006 release, however, was March 8, 2006—roughly two weeks after Mr. Wollman's discharge.

[5] Army Reg. 635-40 ¶ 3-4 notes that eligibility for disability benefits is dependent on satisfying line of duty criteria found in Army Reg. 600-8-1.  The introduction to Army Reg. 600-8-4, however, describes itself as "republish[ing] the guidance for line of duty determinations that was previously omitted from Army Reg. 600-8-1."  Therefore, the court concludes that the portions of Army Reg. 600-8-4 that impact line of duty determinations are incorporated into Army Reg. 635-40 by reference.

[6] Army Reg. 600-8-4's glossary defines EPTS as follows: "[a]ny injury, disease, or illness, to include the underlying causative condition, which was sustained or contracted prior to the present period of [Active Duty] or authorized training, or had its inception between prior and present periods of [Active Duty] or training is considered to have existed prior to service.  A medical condition may in fact be present or developing for [some time] prior to the point when it is either diagnosed or manifests symptoms.  Consequently, the time at which a medical condition 'exists' or is 'incurred' is not dependent on the date of diagnosis or when the condition becomes symptomatic.  (Examples of some conditions which may be pre-existing are slow-growing cancers, heart disease, diabetes, or mental conditions, which can all be present well before they manifest themselves by becoming symptomatic.)."  Id. at 27.

discussed below, if a service member is discharged due to a medical condition that was EPTS <u>and</u> that was not permanently aggravated by service, the member is not entitled to disability compensation.

### i.  Presumptive Determinations Concerning Whether a Disease Is EPTS

Service members are presumed to have been in sound physical and mental condition upon entering active duty except for medical defects and physical disabilities noted and recorded at the time of entrance.  DoDI 1332.38 ¶ E3.P4.5; Army Reg. 635-40 ¶ 3-2(a).  As such, a service member is generally entitled to the presumption that a medical condition discovered after entering active duty was incurred in the line of duty. DoDI 1332.38 ¶ E3.P4.5.2.2; Army Reg. 635-40 ¶ 3-2(a)(2).  This presumption does not apply, however, to congenital, hereditary, or genetic diseases.[7]  DoDI 1332.38 ¶ E3.P4.5.2.2.1; Army Reg. 635-40 ¶ 3-2(a)(2).  Instead, these conditions are presumed to have been incurred prior to entry into active duty (i.e., they are presumptively EPTS). <u>See</u> DoDI 1332.38 ¶ E3.P4.5.2.2; Army Reg. 635-40 ¶ 3-2(a)(2).  DoDI 1332.38 and Army Reg. 635-40 are silent as to whether (or how) a service member with a congenital, hereditary, or genetic disorder can rebut the presumption that the disorder was EPTS.

---

[7] The court notes that <u>Dorland's Illustrated Medical Dictionary</u> (31st ed. 2007) defines these terms as follows: <u>Congenital</u>: existing at, and usually before, birth; referring to conditions that are present at birth, regardless of their causation, <u>id.</u> at 410; <u>Hereditary</u>: genetically transmitted from parent to offspring, <u>id.</u> at 859; <u>Genetic</u>: pertaining to or determined by genes, <u>id.</u> at 781. DoDI 1332.38 uses the terms "congenital," "hereditary," and "genetic" interchangeably. <u>Compare</u> ¶ E3.P4.5.2.2.1 (presumption applies except for congenital or hereditary conditions), <u>with</u> ¶ E3.P4.5.2.2.2 (hereditary and/or genetic disease presumed to have been incurred prior to entry).  By contrast, Army Reg. 635-40 consistently uses only the terms "congenital," or "hereditary."

Neither DoDI 1332.38 nor Army Reg. 635-40 define "hereditary," "genetic," or "congenital" diseases.[8]  Instead, the Army has provided broad guidance for determining whether a condition should be presumed EPTS.  Specifically, Army Reg. 635-40 ¶ 3-3(a) states that "accepted medical principles" have determined that "certain abnormalities and residual conditions exist that, when discovered, lead to the conclusion that they must have existed or have started before the individual entered military service."  Scars, fractures, fibrosis of the lungs, atrophy following disease of the central or peripheral nervous system are listed as examples of conditions "[w]here medical authorities are in such consistent and universal agreement as to their cause and time of origin . . . no confirmation is needed to support the conclusion that they existed prior to military service."  Army Reg. 635-40 ¶ 3-3(a)(1)(h).

The presumption that a non-congenital, non-hereditary, or non-genetic disease was incurred in the line of duty does not automatically entitle a service member to be rated[9] for a disability retirement or severance pay.  See Army Reg. 635-40 ¶ 4-19(e)(2).  The government can still rebut the presumption of service-incurrence by showing that a preponderance of the evidence, based on accepted medical principles, supports a finding

---

[8] Enclosure 4 of DoDI 1332.38 consists of a non-exclusive list of conditions that are cause for referral into the DES, some of which are expressly labeled "congenital."  DoDI 1332.38 ¶ E4.2.7.1 lists the following as examples of congenital spinal diseases: Spina Bifida, Coxa Vara, Spondylolysis/Spondylolisthesis, Kyphosis, and Scoliosis.

[9] The disability rating represents, "as far as can practicably be determined, the average impairment in civilian occupational earning capacity resulting from certain diseases and injuries, and their residual conditions."  DoDI 1332.39 (November 1996); DoDI 1332.38 ¶ E3.P4.6 (compensable disabilities rated according to the Veterans Administration Schedule for Rating Disabilities ("VASRD")).

that the soldier's condition was EPTS.  See Army Reg. 635-40 ¶ 3-2(a)(5); ¶ 4-19(e)(2)

(accepted medical principles required even where no other evidence indicates impairment

was EPTS).  Accepted medical principles are defined as "[f]undamental deductions,

consistent with medical facts[,] that are so reasonable and logical as to create a virtual

certainty that they are correct."  DoDI 1332.38 ¶ E2.1.1.  See also Army Reg. 635-40 at

79 (glossary defining "Accepted Medical Principles" as "[f]undamental deductions that

are consistent with medical facts.  They are accepted for treating and practice in current

major text-books and publications").  This evidentiary showing "differs from personal

opinion, speculation, or conjecture."  Army Reg. 635-40 ¶ 3-2(a)(5).  If the PEB finds

that a condition was EPTS based primarily on accepted medical principles, then those

principles must be cited as part of the decision.  Army Reg. 635-40 ¶ 4-19(e)(2).  When

reasonable doubt exists as to whether the condition was EPTS, the government is directed

to investigate further and, in the absence of sufficient evidence, resolve any dispute

concerning the forgoing presumptions in favor of the service member.  Army Reg. 635-

40 ¶ 3-2(a)(5).

Applied to the case at bar, DoDI 1332.38 and Army Reg. 635-40 entitle Mr.

Wollman to the presumption that his AS was incurred in the line of duty if (1) his AS was

neither noted nor recorded at the time he entered active duty; and (2) AS is not a

congenital, hereditary, or genetic disorder.  If both conditions are satisfied, then the

government bears the burden of showing by a preponderance of the evidence that Mr.

Wollman's AS was EPTS.  This evidence must be based on accepted medical principles,

but need not be confirmed by specific reference to Mr. Wollman's medical records.[10]

However, should the government rely primarily on accepted medical principles to reach

the conclusion that Mr. Wollman's AS was EPTS, then those principles must be cited and

must show "consistent and universal" agreement among medical authorities as to the (1)

cause and (2) time of origin of AS.

### ii. Presumptive Determinations Concerning Whether a Disease Is Aggravated by Service

Even when the government establishes by a preponderance of the evidence that a

disease is EPTS, active duty soldiers are generally entitled to a rebuttable presumption

that any additional disability or aggravation was in the line of duty and therefore

potentially compensable.  See DoDI 1332.38 ¶ E3.P4.5.2.2; Army Reg. 635-40 ¶ 3-

2(a)(3).  This presumption "may only be overcome by competent medical evidence

establishing by a preponderance of the evidence that the disease was clearly neither

incurred nor aggravated while serving on active duty. . . . Such medical evidence must be

based on well-established medical principles, as distinguished from personal medical

opinion alone."  DoDI 1332.38 ¶ E3.P4.5.2.3.  See also Army Reg. 635-40 ¶ 3-2(a)(3)

("specific findings of natural progression" required to overcome presumption of service

aggravation); Army Reg. 600-8-4 ¶ 4-8(e)(3) ("Specific findings of natural progress of

---

[10] Even if the agency is not required to provide the plaintiff with a citation to an accepted medical principle, the record must nevertheless be sufficiently developed to allow for meaningful judicial review.  See Deloach v. Shinseki, 2011-7147, 2013 WL 335945, *9 (Fed. Cir. Jan. 30, 2013).

the pre-existing injury or disease based upon well-established medical principles alone are enough to overcome the presumption of [s]ervice aggravation.").

The presumption that a medical condition that becomes permanently worse during military service was aggravated by that service is not available for cases of congenital, hereditary, or genetic diseases.  See DoDI 1332.38 ¶¶ E3.P4.5.2.2.2, E3.P4.5.2.3.  In such cases, the member must provide clear documentary evidence that his or her condition was service-aggravated or that the member was permitted to continue on active duty "after such a condition, known to be progressive, was diagnosed or should have been diagnosed."  See Army Reg. 635-40 ¶ B-10(c).  The service member may then be entitled to a disability rating for any aggravation of that disease, incurred in the line of duty, beyond that determined to be due to natural progression of the disease.  DoDI 1332.38 ¶ E3.P4.5.2.2.2.

Applying this framework to the case at bar, Mr. Wollman is entitled to the presumption that any aggravation of his AS was due to his military service if AS is not a congenital, hereditary, or genetic disorder.  In that case, the government can rebut the presumption by making a specific finding that a preponderance of the competent medical evidence establishes that any aggravation of Mr. Wollman's AS was due to the natural progression of the disease.  This showing can be made by reference to well-established medical principles alone, and need not specifically refer to Mr. Wollman's medical records.  By contrast, if AS is a congenital, hereditary, or genetic disease, then Mr. Wollman bears the burden of showing, with clear documentary evidence, that his

condition was service aggravated beyond its natural progression or that he was permitted to continue on active duty after his AS was diagnosed or should have been diagnosed.

### B.  Mr. Wollman's Service History[11]

Mr. Wollman enlisted in the U.S. Army Reserve as a cadet on August 23, 1993, at the Oklahoma State University, where he received a scholarship for his education by training in the Reserve Officer Training Corps ("ROTC") program.  AR 288-96.  He was commissioned into the United States Army on May 8, 1998, where he served on active duty in the Field Artillery.  After having served in Iraq from May 6, 2003 until June 10, 2004, Mr. Wollman was discharged as a Captain on February 24, 2006.  AR 283, 297.

### C.  Mr. Wollman's Medical Evaluation Board Proceedings

On June 10, 2005, Mr. Wollman received a permanent medical profile that indicated that he was no longer physically able to perform certain functional activities (e.g., wear body armor, receive live immunizations, carry a 45-pound pack).[12]  AR 271. The profile referred him to a MEB for "Spondyloarthropathy (Sacroiliitis); History of right wrist fracture."  AR 271.  Over the next two months he underwent further medical evaluation, including a rheumatology consultation on July 19, 2005.  AR 264-70.  The

---

[11] The statement of facts are taken largely from the unopposed portions of the government's motion for judgment and supplemented with the administrative record ("AR").  Pursuant to Rule 5.4(a)(3) of the Rules of the United States Court of Federal Claims ("RCFC"), with certain exceptions the plaintiff stipulated to the facts presented in the government's motion for judgment on the administrative record.  Plaintiff's Mot. 4-5.

[12] In a June 29, 2005 memorandum for the Commander of the Landstuhl Regional Medical Center, the Army stated that Mr. Wollman had been unable to complete the 2-mile run as part of the Army Physical Fitness Test for more than two years.  AR 273.  As recently as October 24, 2002, however, Mr. Wollman had been described as "maintain[ing] a good level of physical fitness[,] scoring a 190 on the Army Physical Fitness Test."  AR 315.

consulting rheumatologist reviewed Mr. Wollman's history[13] and symptoms, evaluated him through a physical exam, evaluated his laboratory data and imaging studies, and evaluated his pulmonary function.  AR 262-64.  In his narrative summary prepared for the MEB, the rheumatologist stated that Mr. Wollman had suffered from back discomfort for seven to eight years without a history of injury and that the discomfort was first noted while undergoing a ROTC evaluation.[14]  AR 262.  The rheumatologist further stated that Mr. Wollman received a "waiver" for back pain upon entry into service, and was suspected to have AS in 1995.[15]  AR 262.

---

[13] In late 1994 Mr. Wollman had consulted with civilian orthopedic specialists to determine the cause of his back discomfort.  AR 153.  Following a positive test result for the HLA-B27 antigen in early 1995, his civilian treating physician wrote that, "I have reviewed his LS spine films again and he may have some minor changes at his SI joints however I think [sic] difficult to make the diagnosis of Ankylosing Spondylitis."  AR 153.  In a March 9, 1995 entry in his civilian medical records, his treating physician states, "X-rays brought in by the patient showed a pelvis X-ray.  Difficult to interpret the SI joints on this film.  They were not well-placed on the film.  Hips look unremarkable.  Lumbosacral spine did not show any signs of squaring or characteristic changes of Ankylosing Spondylitis."  AR 158.

[14] On March 17, 1995, Mr. Wollman received a military "fitness for duty" evaluation.  AR 160.  The military physician noted that Mr. Wollman's civilian physicians had interpreted the results of his prior bone scan as "showing possibly early Ankylosing Spondylitis on the right SI joint and [was] otherwise normal."  Ultimately, however, the military physician concluded that, "[given] the physical exam results, patient has symptoms consistent with poor exercise tolerance and finds himself incapable of doing the required physical training in college."  AR 160.  The physician recommended against commissioning Mr. Wollman "secondary to his lack of objective findings and persistent subjective complaints of low back pain and right hip pain."  AR 161-62.  Despite this recommendation, Mr. Wollman was subsequently determined to be "medically qualified for scholarship retention, appointment, combat arms assignment, and Airborne/Ranger training when otherwise qualified."  AR 163-64.

[15] The report from Mr. Wollman's June 12, 1996 military physical does not indicate that he received a waiver for any then-existing physical condition.  To the contrary, it describes him as a "normal healthy male," and specifically lists both his upper extremities and spine as being normal.  AR 338.

The rheumatologist noted that despite improvements with medication, Mr. Wollman still stated that he had difficulty with prolonged standing, sitting, and wearing the equipment required for his military occupational specialty.  AR 262.  He diagnosed Mr. Wollman with AS manifested by HLA-B27 positivity,[16] bilateral sacroiliitis, and history of plantar fasciitis.[17]  AR 264.  Although the rheumatologist found that Mr. Wollman's prognosis was good with performance in a non-physically demanding job, he found that Mr. Wollman was unable to perform the physical requirements of his military occupational specialty and that he failed to meet regulatory retention criteria.  AR 264.

On July 20, 2005, Mr. Wollman's MEB was conducted and memorialized in a standard form.  AR 260-61.  The board indicated that Mr. Wollman had been diagnosed with "Ankylosing Spondylitis manifested by HLA positivity, bilateral [s]acroiliitis and history of plantar fasciitis."  AR 260.  Mr. Wollman did not present views on his own behalf.  AR 260.  The MEB indicated that the condition was EPTS and was permanently aggravated by service.  AR 260.  The form, which did not contain additional narrative, was signed by Colonel Hess, a physician with the United States Air Force.  AR 261.  On July 21, 2005, Mr. Wollman indicated that he agreed with the MEB's findings and

---

[16] The HLA B-27 antigen is strongly associated with the development of arthritic processes. Although the presence of the antigen indicates increased susceptibility to AS, "most HLA-B27 positive persons never develop AS or related diseases."  Muhammad Asim Khan, Ankylosing Spondylitis: Clinical Features, in 2 Rheumatology 16 (John H. Klippel & Paul A. Dieppe eds., 1998).  See n.29, infra.

[17] Although the rheumatologist noted that Mr. Wollman sustained a wrist fracture in 2000, this was not listed as one of the conditions of diagnosis.  AR 263-64.

recommendation and that he did not desire to continue on active duty.  AR 261.  His

matter was forwarded to a PEB.  AR 260.

### D.  Mr. Wollman's Physical Evaluation Board Proceedings

On September 2, 2005, an Informal PEB found that Mr. Wollman was physically

unfit and recommended separation from the service without disability benefits.  AR 254-

55.  In the description of Mr. Wollman's disability, the Informal PEB stated, "Chronic

[b]ack [p]ain first noted while undergoing ROTC evaluation.  The Soldier received a

waiver for the back discomfort as he was suspected in 1995 of having Ankylosing

Spondylitis, which is the current unfitting diagnosis.  There is no history of trauma/injury

while on active duty. . . . There is no evidence of permanent service aggravation.  (MEB

Dx)[.]"[18] AR 254.  The narrative then stated that, "[t]he PEB has reviewed the medical

evidence of record and concludes that there is sufficient evidence to substantiate an EPTS

. . . condition for which you are now unfit.  Your condition has not been permanently

aggravated by service but is the result of natural progression."  AR 254.  The PEB did not

mention either Mr. Wollman's prior wrist fracture or his history of plantar fasciitis as

separate disabling conditions.  AR 254.

Mr. Wollman indicated that he did not concur, AR 255, and on September 20,

2005, he submitted a statement and supporting evidence to the Formal PEB to explain

why he felt the AS was not a preexisting condition.  AR 247-49.  Mr. Wollman stated that

---

[18] The court understands the phrase, "MEB Dx" as referring to the earlier MEB diagnosis, which
was contradicted by the PEB, that Mr. Wollman's condition had been permanently aggravated by
his military service.

his AS diagnosis was made in January 2005, and that, although he had previous back alignment problems in 1995 while he was in ROTC, he did not believe the two were related.  AR 247.  He also stated that the doctor who examined him in 1995 said it was unlikely that he had AS based on X-rays and a bone scan, which the doctor stated would have picked up the earliest symptoms of AS.  AR 247.  Mr. Wollman appended to his petition multiple imaging reports from 2001, including a report dated October 3, 2001 in which the physician stated that "[t]here is no evidence . . . suggestive of ankylosing spondylitis presently."  AR 244.

Mr. Wollman also stated that he did not have a significant change in his health until 2003 to 2004, during the time when he was stationed in Iraq.  AR 248.  Based on an Internet article by Dr. Gabe Mirkin, Mr. Wollman hypothesized that his service in the Army either triggered or aggravated his condition as a result of an intestinal disease that he claimed to have received in Iraq.  AR 247-48, 275.  The article stated that, "[n]obody really knows why you have this condition, but the overwhelming evidence is that you inherited your susceptibility from your parents and you got this condition from an infection."  AR 275.  The article proceeded to review medical literature from 1996-1999 supportive of the hypothesis that AS is triggered by infection.  AR 275-76.[19]

---

[19] Mr. Wollman's statement did not object to the absence of a PEB finding related specifically to either his wrist fracture or prior history of plantar fasciitis.  AR 247-49.

On October 7, 2005, Mr. Wollman's Formal PEB met and came to the same result as the Informal PEB.[20]  AR 237-39.  In the description of his disability, the Formal PEB repeated the Informal PEB's statements concerning the existence of Mr. Wollman's AS prior to entering service, absence of service aggravation, and receipt of a "waiver."[21]  AR 237.  On October 21, 2005, Mr. Wollman indicated his non-concurrence with the decision and submitted a rebuttal.  AR 233-34.  In his rebuttal, Mr. Wollman explained that the Formal PEB suggested that he provide further documentation of the intestinal condition that he had in Iraq or submit a letter from his current doctor in support of his arguments that the intestinal condition aggravated his AS.  AR 233.  Mr. Wollman then explained that, despite his efforts, his evaluating physician assistant from Iraq was unable to locate his medical records and that, without the records from Iraq, his current doctor was unwilling to submit a statement regarding the possibility that his intestinal problem made his AS worse.  AR 233.  On November 2, 2005, the President of the PEB stated that, although Mr. Wollman's case had been carefully reviewed, his rebuttal did not provide information as to any new diagnosis or changes in his currently rated disability.  AR 232.  Accordingly, the PEB affirmed the decision finding him unfit.  AR 232.

---

[20] The findings did not refer to the series of imaging tests conducted on Mr. Wollman from April 28, 2000 through October 29, 2001, none of which diagnosed Mr. Wollman as suffering from AS.  Notably, the findings did not address Mr. Wollman's October 3, 2001 X-rays, which had been ordered specifically to identify "changes seen with Ankylosing Spondylitis," and which concluded that "[t]here [was] no evidence of bambooing of the lumbar spine or changes suggestive of [AS.]"  AR 244.

[21] The October 7, 2005 letter from the PEB did not mention either the wrist fracture or plantar fasciitis, and Mr. Wollman did not address the absence of these conditions in his October 21, 2005 request for relief.

### E.  Mr. Wollman's Correspondence with the USAPDA

On November 28, 2005, Mr. Wollman submitted a request for a new PEB to the Commander of the USAPDA.[22]  AR 221-31.  Mr. Wollman stated that throughout the PEB and rebuttal process, the PEB told him that he needed to provide evidence to prove that the condition did not exist prior to military service or that it was aggravated by military service.  AR 221.  He argued that, pursuant to DoDI 1332.38, the burden was on the Army to rebut the presumption of service-incurrence and aggravation and that the PEB failed to share the basis of its diagnosis of EPTS during the Formal PEB and in the written proceedings, which is required by DoDI 1332.38.  AR 222.  He stressed that thorough civilian and military medical examinations from 1994 through 2001 had failed to confirm a diagnosis of AS.  He noted that his AS diagnosis was not conclusively made until January 2005, when X-rays showed that the disease was still in an early stage.  AR 221.

Mr. Wollman also argued that the PEB failed to provide specific, accepted medical principles that were the basis of finding his disease was not service-aggravated, as required by DoDI 1332.38 ¶ E3.P1.3.4.1.3.1.  AR 222.  As such, he argued that he was denied those presumptions as well as a fair hearing.  AR 222.  He stated that the lack of

---

[22] The USAPDA reviews PEB actions, including but not limited to general officers who are found unfit and Formal PEBs with which the soldier non-concurs.  The purpose of USAPDA review is to ensure, among other things, that (1) the soldier received a full and fair hearing; (2) the proceedings of the MEB and PEB were conducted according to governing regulations; (3) the MEB and PEB findings and recommendations were just, equitable, and consistent with the facts and governing law; and (4) due consideration was given to the facts and requests contained in any rebuttal; and (5) records of the case are accurate and complete.  See Army Reg. 635-40 ¶ 4-22(b).

documentation presented by the PEB fatally impaired his ability to rebut its findings or for another review authority to properly adjudicate his case.  AR 222.  He closed by requesting written documentation on the specific accepted medical principles used by the PEB to overcome the presumption of service-connection or aggravation.  AR 222.  He also requested the right to refute the medical principles in person at a new formal board.  AR 222.[23]

On November 30, 2005, the Chief of the Operations Division for USAPDA ("the Chief") denied Mr. Wollman's request for a new Formal PEB.  AR 195.  The denial stated that after reviewing his request, along with its enclosures and the entire case file, the review resulted in no change to the PEB's findings.  AR 195.  As to the EPTS finding, the Chief noted that Mr. Wollman had not consistently argued that his disease was service-incurred.  Specifically, the Chief stated that Mr. Wollman had initially concurred with the MEB's finding of EPTS, then rebutted that finding before the Informal PEB, then accepted the finding in his presentation to the Formal PEB and in his October 21, 2005 rebuttal to the PEB.[24]  AR 195.  The Chief also quoted part of a sentence from the Mirkin article, stating that there "'was overwhelming evidence that

---

[23] Mr. Wollman did not, however, object to the absence of plantar fasciitis or wrist fracture from the list of disqualifying conditions in the PEB decision.  AR 221-22.

[24] The court notes that, contrary to the USAPDA's statement, nothing in Mr. Wollman's October 21, 2005 rebuttal suggests that he conceded that his disease was EPTS.  AR 233.  To the contrary, Mr. Wollman contested the EPTS finding when he referenced the theory, espoused by Dr. Mirkin, that AS is triggered in people with the HLA-B27 gene following an infection.  AR 233.  Mr. Wollman argued to the USAPDA that although he did not expressly challenge the EPTS finding to the Formal PEB, neither did he concede that his AS was EPTS.  AR 141.

[Mr. Wollman had] inherited [his] susceptibility' to this disease, but there is no evidence that this disease started by any infection during [his] recent active duty period." AR 195.

As to the question of service-aggravation, the Chief explained that Mr. Wollman's complaint of pain in his lower back was not associated with any trauma, either currently or in 1995, and was consistent with his present diagnosis. AR 195. She also explained that the natural progression of the AS condition was one of a gradual progression of symptoms, with increasing signs of bone involvement by X-rays. AR 195. She stated that "medical sources and literature uniformly confirm" that the progression of Mr. Wollman's AS was normal for the condition. AR 195. Although she acknowledged that the PEB had not specifically cited to medical resources in its findings, the Chief asserted that "such literature was unnecessary because of the almost universal acknowledgment concerning the natural progression" of AS. AR 195. As such, she concluded that the presumption of service aggravation had been overcome. AR 195.

On December 23, 2005, Mr. Wollman submitted a congressional inquiry to Senator James Inhofe, in which he presented substantially similar arguments as he had presented to the USAPDA. AR 188-20. He added that Army Reg. 635-40 provided for the compensation of soldiers with preexisting conditions who are allowed to serve with the condition after the condition had, or should have been, diagnosed. AR 192. He argued to the Senator that if the PEB found that he had the condition while in ROTC, then it had a regulatory duty to compensate him. AR 192.

On January 11, 2006, the Deputy Commander from USAPDA replied to the Senator. AR 186-87. He provided a short history of the case, and stated that the Formal

18

PEB, following a complete and thorough review of the case, upheld the findings of the Informal PEB based on the testimony of Mr. Wollman, arguments from his attorney, and the medical evidence presented.  AR 186.  He noted that USAPDA upheld the Formal PEB decision.  AR 186.  He explained that Mr. Wollman's comments regarding Army Reg. 635-40 were misplaced, because it applies to conditions that are otherwise disqualifying but have been fully treated (in that case, if the military still takes no action to separate the soldier, then the soldier's condition is compensable).  AR 187.  The Deputy Commander explained that in Mr. Wollman's case, however, Mr. Wollman's back condition was only recently found to not meet medical retention standards and that, after a reasonable period passed in attempting to correct the condition, the separation action commenced as required.  AR 187.  The Deputy Commander then stated that Mr. Wollman was not entitled to another formal hearing, as Mr. Wollman was fully counseled and adequately notified of the basis of the PEB's findings and recommendations.  AR 187.  Although he did not provide a specific citation, the Deputy Commander stated that the findings were fully supported by established medical literature.  AR 187.

Also on January 11, 2006, Mr. Wollman requested that the USAPDA again review the physical evaluation process that occurred from July 2005 through October 2005.  AR 136-85.  Mr. Wollman argued that he never received a medical waiver to join the Army and that his medical evaluation in 1995 found that he was medically qualified for retention and for appointment to a combat arms assignment.  AR 136-37.  As such, he claimed that the PEB's determination that his condition was EPTS was based upon erroneous information (i.e., a non-existent entry waiver) and that it failed to follow DoD

standards for determinations of conditions that are EPTS.[25]  AR 136.  He stated that

under DoD guidance, there must be clear and unmistakable evidence that the disease or

injury, or the underlying condition producing the disease or injury, existed prior to the

individual's entry into military service, AR 137, and that the PEB completely ignored the

overwhelming evidence that indicated that his AS manifested some years after his entry

onto active duty.  AR 136.  Although Mr. Wollman conceded that he had signed the MEB

form acknowledging that his condition was EPTS, he claimed that he did so assuming

that he would have a subsequent opportunity to present facts rebutting that finding.  AR

141.

       The plaintiff also stated that even if his condition was EPTS, there was substantial

medical documentation that his military service aggravated his condition.  AR 136.

Specifically, he argued that his condition was aggravated by either incurrence of an

intestinal disease in Iraq, or by the physically demanding nature of military service.[26]  He

claimed that under Army Reg. 635-40, even if the PEB continued to insist that his

condition was EPTS, and was not aggravated by military service, he was still due

---

[25] Mr. Wollman's request for review did not take issue with the Army's decision not to rate him
for either his wrist fracture or history of plantar fasciitis.  AR 221-22.

[26] In his request for review, Mr. Wollman cited, among other medical sources, Michael M. Ward,
et. al., Risk Factors for Functional Limitations in Patients with Long-Standing Ankylosing
Spondylitis, 53 Arthritis & Rheumatism (No. 5) 710 (2005) (functional limitations in patients
with AS for 20 years are greater among those with a history of more physically demanding jobs).
AR 142-49.

disability compensation because he was allowed to enter onto active duty with a condition that should have diagnosed and deemed disqualifying.[27] AR 136.

He also argued that service members must be granted presumptions of fitness and service-aggravation for their disabilities, and that PEBs must use and document the medical principles relied upon to overcome these presumptions.  AR 138-39 (citing DoDI 1332.38).  He then demanded that the USAPDA produce the medical sources and literature supporting its opinion, and claimed that the USAPDA's failure to offer these sources prevented him from producing medical sources to rebut the USAPDA's contention that there is a uniform medical opinion concerning the natural progression of AS.  AR 139.

On January 26, 2006, the USAPDA denied Mr. Wollman's request for review, stating that USAPDA had again reviewed his entire case file, and that although the PEB erroneously stated that Mr. Wollman received a medical waiver to enter the military, the PEB did not consider the waiver to have invoked a different standard regarding the presumption of service-aggravation found in DoDI 1332.38.[28]  AR 134.  The USAPDA also noted that it had not considered the waiver in its review of the PEB's finding, nor

---

[27] Army Reg. 635-40 ¶ B-10(c) states "Hereditary, congenital and other EPTS conditions frequently become unfitting through natural progression and should not be assigned a disability rating unless service aggravated complications are clearly documented or unless a soldier has been permitted to continue on active duty after such a condition, known to be progressive, was diagnosed or should have been diagnosed."

[28] DoDI 1332.38 ¶ E3.P4.5.5 states that members who are determined unfit for service due to a condition for which the member received a waiver upon entry into service are not entitled to disability separation or retired pay unless service permanently aggravates the condition or hastens its rate of progression.

had the USAPDA cited to the waiver in its November 30, 2005 response to Mr.

Wollman's initial appeal.  AR 134.

After reiterating elements of the USAPDA's November 30, 2005 letter, the Chief

stated that any preliminary confusion by prior medical reviews or initial inaccurate

diagnoses were overcome by the present universally-accepted diagnosis of AS.  AR 134.

She also explained that the course of AS varies among patients and that there may be

different natural progressions for different people, and that the failure of AS to follow a

single course did not mean that there was an unnatural progression of AS.  AR 134.  She

stated that for most diseases or medical conditions, one or several courses are seen more

frequently than others, and that in Mr. Wollman's case, the symptoms' progression and

diagnostic confirmation supports the PEB's conclusion that the AS began prior to service.

AR 134.  She also included a medical reference in support of the USAPDA's position.

AR 134 (citing "Rheumatology, 2nd ed. Eds. John Klippel and Paul Dieppe. Volume 2:

16.14.1 thru 6.19.10. Mosby") ("Rheumatology").[29]

Although she did not address the discrepancy between the MEB and PEB findings

concerning service aggravation, the Chief stated that the PEB finding was supported

because "nothing in [Mr. Wollman's] duty history overcomes the conclusion that the

natural course (and variations) of [Mr. Wollman's] condition can account for [the PEB's]

medical findings."  AR 135.  She also suggested that the condition may be more disabling

---

[29] Pursuant to this court's order, on December 19, 2012 the government supplemented the
administrative record with a copy of this treatise.  See ECF No. 25.  The government clarified
that the treatise cited to Mr. Wollman by the USAPDA should have read, "6.14.1 through
6.19.10."

in heavy physical laborers because laborers make more use of the spine in their jobs, not because the work caused or unduly accelerated their condition.  AR 135.  She also stated that exercise, except in rare circumstances, was important in a treatment program.  AR 135.  She recognized that his comments about pain with increased activity were likely accurate, but that such increased pain, with increased activity, was not abnormal and did not represent a permanent aggravation.  AR 135.

Lastly, the Chief stated that Mr. Wollman's reliance on AR 635-40 was misplaced because the provision only applies when the Army fails to separate an unfit service member after treatment for an unfitting condition is unsuccessful.  She stated that in Mr. Wollman's case, his AS had only recently been found not to meet retention standards and that, after a reasonable time had passed in which the Army attempted to correct the condition, the separation action was initiated as required.  AR 135.

### F.  The Dominguez Letter

On January 30, 2006, Lieutenant Colonel Marie Dominguez ("Dr. Dominguez"), the Division Surgeon from Mr. Wollman's unit, sent a memorandum to the President of the PEB requesting that his "PEB be withdrawn and re-submitted with a comprehensive and factual Narrative Summary of his disease process and evaluation."[30]  AR 129-30.  The request stated that the PEB had considered an incomplete medical history and included factual errors that, in Dr. Dominguez's opinion, were undoubtedly prejudicial to a fair and unbiased hearing.  AR 129.  Specifically, Dr. Dominguez asserted that no

---

[30] Dr. Dominguez sent the letter through Colonel Todd Hess, who was one of the medical officers who signed Mr. Wollman's MEB report.  AR 130.

entry-waiver was required or given for Mr. Wollman's AS because detailed examinations found that no disease processes were present when he entered service. She claimed that although Mr. Wollman signed his MEB form that stated his AS was EPTS, Mr. Wollman had done so with a misunderstanding of the term "waiver" and only after his request to change the wording on the MEB form had been denied. AR 129. The letter also stated that the narrative summary, which was written in preparation for the MEB, did not include the comprehensive clinical evaluations that Mr. Wollman received in ROTC as part of his evaluation for entry into the service, which specifically found no evidence of arthritis or disease. AR 129. Dr. Dominguez asserted that these evaluations were detailed in scope, because Mr. Wollman was known to be positive for the HLA B-27 antigen, which is sometimes associated with arthritic processes. AR 129.

Dr. Dominguez also wrote that Mr. Wollman was a victim of poor representation, arguing that Mr. Wollman was stationed in Germany, which did not have an attorney trained to represent soldiers in matters of disability processing, and that the first time Mr. Wollman had legal representation was at his Formal PEB hearing. AR 129. She also stated that, at that hearing, Mr. Wollman's attorney (1) failed to identify that detailed medical evaluations were completed prior to Mr. Wollman's commissioning, which found him fit and without any disqualifying condition; (2) failed to state that no waiver was required, and that the waiver did not exist; and (3) allowed the proceedings to be sidetracked by theoretical discussions on the etiology of AS. AR 129.

The letter concluded by stating that, "[p]erhaps through retrospection, we could say that the back pain he experienced in his earlier years was attributable to his disease,

but this is speculation." AR 130. She noted that at least four separate physicians, including a rheumatologist, evaluated Mr. Wollman prior to entry into the service and found no evidence of an unfitting condition, let alone clear and unmistakable evidence.[31] AR 130. On February 3, 2006, Dr. Dominguez's letter was passed to Army Human Resources Command by Major General Robinson, who was Mr. Wollman's Division Commander at the time. AR 131-32.

Apparently in response to this memorandum, Dr. David Armitage, from the Walter Reed Army Medical Center, sent an email to the Deputy Commander of the USAPDA to explain that the USAPDA had already reviewed Dr. Dominguez's concerns. AR 122. Dr. Armitage stated that the issues raised had already been considered and that the USAPDA recognized that the file contained no waiver and explained that the absence of a waiver did not alter the adjudication of the case. AR 122. Dr. Armitage also stated that, even absent a waiver, the PEB's finding that Mr. Wollman was unfit because of a medical condition that had its onset prior to entry was supportable, even though it was not fully diagnosed at entry. AR 122. Dr. Armitage further stated that the referenced records in Dr. Dominguez's letter already were provided to the USAPDA by Mr. Wollman and were given due consideration in the review process. AR 122.

---

[31] Dr. Dominguez may have been referring to the definition for EPTS found in DoD 6015.1-M ¶ P5.1.23 ("A term used to signify there is clear and unmistakable evidence that the disease or injury, or the underlying condition producing the disease or injury, existed prior to the individual's entry into military service."). The court addresses the proper standard of evidence for rebutting the presumptions of service-incurrence and aggravation, infra.

Dr. Armitage explained that "the mere failure or inability to diagnose a medical condition in the past does not mean that the condition–later correctly diagnosed–was not in an early phase of its existence.  Many medical conditions develop gradually over time and are obscured from a definitive diagnosis until time and additional symptoms or testing later support a specific diagnosis as was the case [with] C[aptain] Wollman."  AR 122.  He further stated that "[r]etrospection in such a case is not only permissible, but aids both the diagnostic and the adjudicative process."  AR 122.

Dr. Armitage concluded that the reasons cited by Dr. Dominguez to have the case recalled were not justified, and that issues of that kind are managed with written addenda, clarifying memoranda, or other documented forms of communication.  AR 122.  On February 24, 2006, Mr. Wollman was discharged from the Army.  AR 116-18.

### G. Actions by the Army after Mr. Wollman's Discharge

On February 20, 2007, pursuant to 10 U.S.C. § 1554, the APDRB convened to hear Mr. Wollman's case.  AR 19.  Mr. Wollman submitted a sworn statement along with additional medical records to the APDRB.  AR 21-115.  These records included, inter alia, a January 23, 2007 opinion from a rheumatologist that Mr. Wollman did not begin to show signs of an inflammatory disease until at least 2002.  AR 115.  Argument was also heard from Mr. Wollman's representative from the American Legion.  AR 21-24, 28-92.  The plaintiff raised the following issues: (1) that Mr. Wollman never signed a waiver to join the Army, the misrepresentation of which biased the PEB and USAPDA's findings; (2) that the PEB erred when it did not apply the burden of proof set out by DoDI 1332.38 to show that Mr. Wollman's condition was EPTS and was not aggravated by service; (3)

26

that Mr. Wollman was precluded from formulating a precise rebuttal to the PEB and

USAPDA because the PEB and USAPDA did not properly document, per DoDI 1332.38,

the accepted medical principles supporting their findings; and (4) that the MEB erred

when it did not address other diagnoses for the cause of Mr. Wollman's early back pain.[32]

AR 21-24.

On March 9, 2007, the APDRB affirmed the findings of the October 7, 2005 PEB

and the USAPDA's November 2, 2005 review of that decision.[33]  AR 19.  In his decision

memorandum, the Acting Deputy Assistant Secretary for Army Review Boards stated

that, after reviewing all of the records, including Mr. Wollman's submissions, as well as

his testimony and that of his representative, the board unanimously denied Mr.

Wollman's request that he be medically retired from the Army.[34] AR 19.  The

memorandum also stated that the board had unanimously denied Mr. Wollman's request

to find service-aggravation for his condition, and denied his request to find that his

condition was service-connected.  AR 19.  The Acting Deputy Assistant Secretary further

determined that Mr. Wollman had received a full and fair hearing and that the

proceedings had conformed to law and regulation.  AR 19.

The plaintiff timely filed this suit in the United States Court of Federal Claims on

---

[32] Mr. Wollman did not address the absence of a separate rating for his history of plantar fasciitis or a wrist injury at the MEB, PEB, or USAPDA.  AR 21-24.

[33] The government notes that the APDRB misstated the USAPDA review date as occurring on November 7, 2005.

[34] The parties dispute whether the voting record, AR 20, reflects a unanimous vote by the APDRB.  Pl. Mot. 5.  The court need not reach this question to address the merits of Mr. Wollman's claims.

February 23, 2012.  Compl. at 1.  Briefing was completed on October 2, 2012 and

argument was held on January 28, 2013.[35]

## II.    DISCUSSION

### A. Standard of Review

The Tucker Act provides the court with jurisdiction over "any claim against the

United States founded either upon the Constitution, or any Act of Congress or any

regulation of an executive department, or upon any express or implied contract with the

United States, or for liquidated or unliquidated damages in cases not sounding in tort."

28 U.S.C. § 1491(a) (2006).  Although the Tucker Act does not provide a substantive

right to damages from the United States, this right has been found in the Military Pay

Act, 37 U.S.C. § 204 (2006) and 10 § U.S.C. § 1201.  Martinez v. United States, 333 F.3d

1295, 1315 (Fed. Cir. 2003) (37 U.S.C. § 204 is money-mandating); Fisher v. United

States, 402 F.3d 1167, 1174 (Fed. Cir. 2005) (10 U.S.C. § 1201 is money-mandating).

The Court of Federal Claims acquires jurisdiction over claims for military

disability retirement after an appropriate military board has evaluated the service

member's entitlement to such retirement in the first instance.  See Chambers v. United

---

[35] Prior to filing his complaint with the United States Court of Federal Claims, Mr. Wollman
filed a complaint in the Eastern District of Virginia stemming from a November 2005 decision of
the Army Discharge Review Board that the board lacked authority to review whether he should
have been discharged with pay.  See Wollman v. Geren, 603 F. Supp. 2d 879, 880-81 (E.D. Va.
2009) (granting government's motion to dismiss because Army Discharge Review Board
decision was not final agency action).

Although Mr. Wollman initially requested that the Court of Federal Claims review the actions of
the Army Discharge Review Board as part of the instant litigation, the plaintiff subsequently
withdrew this argument.  Pl. Reply 7.  Therefore the court considers these arguments waived and
does not reach the question of whether the Army Discharge Review Board committed error.

States, 417 F.3d 1218, 1225 (Fed. Cir. 2005); Scarseth v. United States, 52 Fed. Cl. 458,

479-80 (2002) (claim not ripe until considered by MEB, PEB, or Army Board for

Correction of Military Records). The court's task is limited to determining whether the

board's decision was arbitrary, capricious, unsupported by substantial evidence, or

contrary to law.[36] The substantial evidence standard is satisfied when the record reflects

"relevant evidence [sufficient for] a reasonable mind [to] accept as adequate to support a

conclusion." Gossage v. United States, 394 F. App'x 695, 697 (Fed. Cir. 2010) (quoting

Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Verbeck v. United States, 89

Fed. Cl. 47, 63 (2009). The court will not engage in a reweighing of the evidence that

was before the board. Heisig v. United States, 719 F.2d 1153, 1157 (Fed. Cir. 1983).

Moreover, the board is entitled to a presumption that its members acted in good faith in

executing their duties. See Van Cleave v. United States, 70 Fed. Cl. 674, 679 (2006).

Thus, as long as the APDRB followed applicable law in reaching a reasonable conclusion

---

[36] The court applies the same deferential standard of review regardless of whether the plaintiff
seeks relief directly from a decision of a PEB, from an intermediate board authorized to fully
grant the plaintiff's claim, or from a board of corrections for military records. Compare Barnick
v. United States, 591 F.3d 1372, 1377 (Fed. Cir. 2010) (decision of Air Force Board for the
Correction of Military Records), Fisher v. United States, 402 F.3d 1167, 1184 (Fed. Cir. 2005)
(decision of Air Force Board for the Correction of Military Records), Chambers v. United States,
417 F.3d 1218, 1227 (Fed. Cir. 2005) (decision of Army Board for the Correction of Military
Records), Peoples v. United States, 101 Fed. Cl. 245, 262-63 (2011) (decision of Board for
Correction of Naval Records), and Loomis v. United States, 68 Fed. Cl. 503, 508 (2005)
(decision of Army Board for Correction of Military Records); with Bernard v. United States, 59
Fed. Cl. 497, 500-01 (2004) (decision of PEB and USAPDA) aff'd, 98 F. App'x 860 (Fed. Cir.
2004), Santiago v. United States, 71 Fed. Cl. 220, 229-30 (2006) (decision of Army PEB),
Pomory v. United States, 39 Fed. Cl. 213, 216-17 (1997) (decision of USAPDA), and Randolph
v. United States, 31 Fed. Cl. 779, 782 (1994) (decision of Navy PEB).

after considering the relevant evidence in the record, the court will not disturb its

decision.  See Petri v. United States, 104 Fed. Cl. 537, 550 (2012).

## B. Evidentiary Standards Related to the Presumptions of Service-Incurrence and Aggravation

Before turning to the merits of the case, the court must address the appropriate

evidentiary standard for rebutting the presumptions of service-incurrence and

aggravation.[37]  The plaintiff contends that the Army must come forward with "clear and

unmistakable evidence" in order to rebut the presumption that a service member was

healthy upon entry.  Pl. Mot. 7-8; Pl. Reply 2.  In support of this proposition, Mr.

Wollman argues that that court should adopt the definition of "Existed Prior to Service"

that is listed in DoD 6015.1-M (January 1999).  This manual, which is titled "Glossary of

Healthcare Terminology," defines "Existed Prior to Service" as "signify[ing that] there is

clear and unmistakable evidence that the disease or injury, or the underlying condition

producing the disease or injury, existed prior to the individual's entry into military

service."  Pl. Mot. 7-8.  In essence, the plaintiff argues that because this instruction was

---

[37] The government contends that the plaintiff has waived the right to dispute this standard.  Def. Reply 3.  At the APDRB, the plaintiff argued, inter alia, that "[t]he PEB and USAPDA failed to produce clear and unmistakable evidence, using well established medical principles to establish their claim that [Mr. Wollman's] condition existed prior to service and was not permanently aggravated by service."  AR 17.  The crux of the plaintiff's argument was that the Army had applied an incorrect evidentiary standard and not—as the government apparently contends—the precise source of that evidentiary standard.  This situation contrasts sharply with the case cited by the government, Metz v. United States, 466 F.3d 991, 999 (Fed. Cir. 2006) (ineffective assistance of counsel argument waived when not first raised before the review board), and is instead consistent with the other case that the government cites, Conant v. OPM, 255 F.3d 1371, 1375 (Fed. Cir. 2001) (arguments consistently raised concerning breach of settlement agreement not waived).  Because the plaintiff consistently raised this issue with "sufficient specificity and clarity" to put the APDRB on notice, id. at 1376, the court rejects the government's argument that Mr. Wollman waived the right to challenge the evidentiary standard in this court.

released after the 1996 version of DoDI 1332.38 (which applies to the instant case), it

served to raise the evidentiary standard for an EPTS finding for the entire DoD and for all

purposes.  Id.  The plaintiff also notes that the "clear and unmistakable evidence"

standard is consistent with the standard used by the Department of Veterans Affairs

("VA"), as well as with 2008 changes to DoDI 1332.38.  Pl. Reply 3-4.

Although the forward to DoD 6015.1-M states that the manual is mandatory and

applies to all DoD components, the court is persuaded by the government's argument

that, absent evidence of a contrary intention of DoD, a definition appearing in a DoD

glossary should be read as limited to the purposes of its authorizing regulation, in this

case DoDI 6015.23 (December 1996) (Delivery of Healthcare at Military Treatment

Facilities).  Def. Reply 3-4.  Equally important, there is strong evidence that suggests that

the Army knew that it could raise the evidentiary standard for EPTS to "clear and

unmistakable," but chose not to.  Army Reg. 600-8-4, which was published in 2004,

includes a definition for EPTS that does not contain "clear and unmistakable" as part of

any evidentiary standard.  Army Reg. 600-8-4 at 27.  Moreover, Army Reg. 600-8-4 does

use "clear and unmistakable" in connection with overcoming the presumption that a death

is not by suicide.  Army Reg. 600-8-4 ¶ B10 Rule 10.

The cited VA statute provides similarly little support to the plaintiff, as it is well

established that the VA "operates under different laws and standards and for different

purposes than the military when it comes to deciding disability entitlements."  Hinkle v.

United States, 229 Ct. Cl. 801, 804-05 (1982) (VA determinations not binding on the

court when determining claims for military disability retirement).  Nor can this court

accept the plaintiff's argument that a subsequently released DoD instruction, in this case

DoDI 1332.38 (October 2008), should have retroactive effect.  As this court has

previously observed, "[c]oncerns about retroactivity arise when the government

endeavors to apply a new regulation to a condition that arose before the regulation was in

effect."  Poole v. United States, No. 02-454(c) 2006 WL 5625386, at *3 (Fed. Cl. July 20,

2006) (citing Kearfott v. United States, 320 F.3d 1369,1374 (Fed. Cir. 2003)).  In this

case, as in Poole, the government was free to apply the regulations that were in force at

the time the plaintiff entered the DES.  Id.

In sum, the court holds that DoD 6015.1-M did not raise the evidentiary standard

that applied when the Army evaluated Mr. Wollman's claims.  The court now turns to

whether the Army properly applied those standards in adjudicating Mr. Wollman's

claims.

## C.  The Court Is Unable to Determine on This Record Whether the APDRB Correctly Applied the Proper Presumptions for Service Incurrence and Aggravation

When reviewing a motion for judgment on the administrative record under RCFC

52.1(c), the court may make factual findings based on record evidence "as if it were

conducting a trial on the record."  See Bannum, Inc. v. United States, 404 F.3d 1346,

1353-56 (Fed. Cir. 2005).  Unlike a motion for summary judgment under RCFC 56, the

existence of a disputed material fact does not preclude the court from reaching a decision.

Id. at 1355.  Even when the administrative record is silent as to some disputed facts, the

court may still render judgment if the agency provided an adequate discussion of the

bases of its decision.  See Rebosky v. United States, 60 Fed. Cl. 305, 311-13 (2004)

(corrections board does not need to discuss every piece of evidence presented in its decision).

Remanding a case may be appropriate, however, when a corrections board's decision is so conclusory or so lacking in discussion that the court is prevented from determining the bases for the board's decision.  See, e.g., Deloach v. Shinseki, 2011-7147, 2013 WL 335945, at *9 (Fed. Cir. Jan. 30, 2013) (remand appropriate if court cannot understand the precise basis for board action and conduct informed review); Verbeck v. United States, 97 Fed. Cl. 443, 457 (2011) (remand appropriate where board's failure to discuss conflicting evidence prevented court from determining whether errors and omissions were harmless); Santiago v. United States, 71 Fed. Cl. 220, 229 (2006) (remand appropriate where PEB provided no rationale for not compensating service-member's diagnosed illness); Pomory v. United States, 39 Fed. Cl. 213, 215-16 (1997) (discussing remand where PEB reversed MEB determination of service-aggravation without sufficient explanation); Craft v. United States, 210 Ct. Cl. 170, 181-82 (1976) (conclusory determinations that do not discuss any details or specify precisely what items of evidence were considered cannot be sustained); see also Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").  Here a remand is necessary for the reasons that follow.

As discussed, supra, the presumption that a member was fit on entry applies unless either (1) the condition was noted and recorded on entry to active duty, or (2) the disease

is congenital, hereditary, or genetic. In this case, there is no serious contention that Mr.

Wollman had been diagnosed with or received a waiver for AS upon entering service.

The parties do dispute, however, whether or not AS is a congenital, hereditary, or genetic

condition. If AS is a congenital, hereditary, or genetic disease—as the government

contends—then Mr. Wollman's disease was presumptively EPTS. Moreover, the

plaintiff would bear the burden to produce clear documentary evidence that any

permanent worsening was due to his military service, rather than the natural progression

of the disease. On the other hand, if the disease is not congenital, hereditary, or genetic,

then the government would have the burden to rebut the presumption of service-

incurrence and the presumption that any permanent worsening of his disease was due to

his military service. Therefore, resolving the question of AS's etiology is critical to

determining whether the Army properly applied its regulatory presumptions. [38]

Although the court may resolve factual disputes on a motion for judgment on the

administrative record, Bannum, 404 F.3d at 1354, the record in this case is too sparse to

proceed. See Deloach v. Shinseki, 2011-7147, 2013 WL 335945, at *9 (Fed. Cir. Jan. 30,

2013) (citing Fla. Power & Light Co., 470 U.S. at 744); Adams v. Principi, 256 F.3d

1318, 1322 (Fed. Cir. 2001). Neither the record before the APDRB nor the APDRB's

written statement clearly indicate whether—and on what basis—the MEB, PEBs or the

_____

[38] The court disagrees with the plaintiff that the government is making a post-hoc rationalization by arguing that AS is a congenital, hereditary, or genetic disease. Pl. Reply 8 (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168-69 (1962)). The crux of the instant dispute is whether or not the Army properly applied regulatory presumptions concerning service-incurrence and aggravation. That a particular disease is congenital, hereditary, or genetic is a factual question that must be answered before the reviewing court can competently consider the Army's treatment of Mr. Wollman's claims.

USAPDA might have determined AS to be a congenital, hereditary, or genetic

condition.[39]   Indeed, the court cannot say, based on the record before the court, that such

a conclusion would have been supported by substantial evidence.   The medical article

submitted by Mr. Wollman as part of his rebuttal does not expressly state that AS is a

congenital, hereditary, or genetic disease.   AR 195.   To the contrary, the article states that

there is "overwhelming evidence that [AS patients] inherited [their] <u>susceptibility</u> from

[their] parents and . . . <u>got the condition</u> from an infection."   AR 275 (underline

provided).   It is not clear to the court that "genetic susceptibility," alone, is sufficient to

establish a "genetic disease" for the purpose of applying the disability presumptions.   In

this connection, the medical treatise to which the USAPDA eventually cited,

<u>Rheumatology</u>, states that the etiology of AS is unclear.[40]   Further, the court lacks the

expertise to conclude—as the government invites—that AS is similar to the spinal

diseases listed as "congenital" in DOD 1332.38.[41]   Def. Mot. 28.   The evidence in the

---

[39] The discussion of service-aggravation in the USAPDA's January 26, 2006 letter to Mr.
Wollman suggests that the USAPDA had assumed that Mr. Wollman's disease was congenital,
hereditary, or genetic.   Specifically, the USAPDA stated that "nothing in [Mr. Wollman's] duty
history . . . overcomes the conclusion that the natural course (and variations) of [his] condition
can account for the medical findings."   AR 135.   The court understands this statement as
meaning that the USAPDA had shifted the burden of proving service-aggravation to Mr.
Wollman.   As discussed at length, <u>supra</u>, DoDI 1332.38 ¶¶ E3.P4.5.2.2.2, E3.P4.5.2.3 places the
burden on the government to rebut the presumption of service-aggravation, with the narrow
exception of congenital, hereditary, or genetic diseases.

[40] "As in other diseases <u>where the etiology is not clearly defined</u>, the diagnosis of AS is based on
clinical (including radiographic) features."   AR Supp. at 16.3 (emphasis added).   <u>Accord</u>
<u>Dorland's Illustrated Medical Dictionary</u>, 1779 (31st ed. 2007) (stating AS "is a systemic illness
of unknown etiology").

[41] The court notes that the record does not demonstrate that AS is a disease existing at, and
usually before, birth.   <u>See</u> <u>Dorland's Illustrated Medical Dictionary</u> 410 (31st ed. 2007) (defining

current record is simply not sufficient to support the government's claim that AS is "hereditary in nature."  Def. Reply 4 n.3.

Understanding the etiology of a disease, for the reasons discussed above, is critical to properly applying the presumptions of service-incurrence and aggravation.  Without a record that meaningfully addresses this question, the court will not speculate as to that etiology.  In this connection, the court notes that this is not the first time that the unresolved etiology of a medical condition or proof of its existence prior to service has been at issue in a disability case.  See, e.g., Lipp v. United States, 181 Ct. Cl. 355, 361 (1967) (multiple sclerosis); Reese v. United States, 180 Ct. Cl. 932, 942 (1967) (hip injury); Siegel v. United States, 148 Ct. Cl. 420, 428 (1960) (syringomyelia); Finn v. Shinseki, 11-1835, 2012 WL 2476799, at *5-6 (Vet. App. June 29, 2012) (multiple myeloma).  Indeed, in Lowe v. Derwinski, 2 Vet. App. 495, 498-99 (1992), the United States Court of Veterans Appeals held that, in the absence of contrary evidence or medical treatises, the Board of Veterans Appeals failed to demonstrate that AS was a genetic disease.[42]

------------------------------------------------------------

congenital disease).  For example, the treatise on which the government relies, Rheumatology, indicates that clinical manifestations usually begin in late adolescence or early adulthood, and that only a small subset of patients have onset before age 16.  Rheumatology at 16.2.

[42] Notably, the plaintiff's physicians in Lowe acknowledged that, "although ankylosing spondylitis is associated with genetic predisposition, it is well known that it is initiated by external stimuli such as infection and/or trauma."  Id. at 498 (internal quotations omitted).

It is for these reasons that, the court finds that a remand to the APDRB to address the issue of etiology is proper.[43]   On remand, the APDRB must determine whether AS can be properly characterized as a congenital, hereditary, or genetic disease and, if so, the basis for that conclusion.  If the APDRB concludes that "genetic predisposition" or "susceptibility" is not synonymous with a genetic disease, then the APDRB will need to carry its burden of showing that Mr. Wollman's AS was EPTS and that any worsening of his disease was not due to military service.  Should this analysis prove necessary, the board should also address (1) the undisputed fact that the plaintiff continued to pass his Army Physical Fitness Tests until at least October 24, 2002; and (2) that the plaintiff's military physicians concluded that Mr. Wollman's X-ray, CT, and MRI results did not indicate that he had contracted AS until January 2005.  In addition, Mr. Wollman should be provided an opportunity to respond to the board's findings.  To the extent that the APDRB primarily relies on "accepted medical principles" to reach its conclusions, the board should provide the sources or principles relied upon to Mr. Wollman prior to rendering a final decision.[44]

### D.  The Plaintiff Waived his Claims to Disability Stemming from his Wrist Fracture and Plantar Fasciitis Independent of his AS

---

[43] The court stresses that the APDRB's decision to affirm the USAPDA's opinion very well may prove to be correct.  At this time, however, the record is not sufficiently developed to determine the basis and exact justification for the APDRB's decision.

[44] Because of the remand, the plaintiff's objections to the delay in citing to <u>Rheumatology</u> and to the MEB and PEB's prior error regarding receipt of a "waiver" upon entering service are moot and need not be addressed.

The government contends that Mr. Wollman waived any claims regarding his plantar fasciitis and his wrist disability separate from his AS because he did not present these claims to the APDRB.  Def. Mot. 20.  In response, the plaintiff argues that he preserved those claims because the record before the APDRB included documents from the evaluation boards and correspondence with Senator Inhofe that had mentioned these conditions.  Further, the plaintiff notes that, in his arguments to the APDRB, he stated that he was suffering from reactive arthritis manifested by inflammation and arthritic symptoms of the wrists.  Pl. Mot. 4-5; Pl. Reply 8.

The court concludes that the plaintiff's mere reference to these conditions did constitute proper challenges to adverse administrative action.  Each decision letter from the Informal PEB, Formal PEB, and the voluminous correspondence with the USAPDA put Mr. Wollman on notice that the Army did not intend to grant a disability retirement for these conditions.  See Metz v. United States, 466 F.3d 991, 999 (Fed. Cir. 2006).  Nor can the court reasonably conclude that vague references in the record submitted to the APDRB regarding his plantar fasciitis or a prior wrist injury were sufficiently specific, clear, or timely to put the APDRB on notice that it should consider rating these conditions.  See Conant v. OPM, 255 F.3d 1371, 1375 (Fed. Cir. 2001).  Therefore, the court holds that Mr. Wollman waived any argument he might have had for claims related to his plantar fasciitis or a prior wrist injury independent of his claim for AS.  Murakami v. United States, 398 F.3d 1342, 1354 (Fed. Cir. 2005).

### E.  The Plaintiff Is not Entitled to Be Restored to Active Duty

The court also denies Mr. Wollman's request to be restored to active duty and to receive active-duty pay during for the period of alleged wrongful government action. Compl. at 14.  Mr. Wollman appears to be invoking the constructive service doctrine, under which "military personnel who have been illegally or improperly separated from service are deemed to have continued in active service until their legal separation." Barnick v. United States, 591 F.3d 1372, 1379 (Fed. Cir. 2010) (citing Christian v. United States, 337 F.3d 1338, 1347 (Fed. Cir. 2003)).  In Barnick, the Federal Circuit expressly held that for this doctrine to apply, the plaintiff must allege that he or she would have remained in the military on active duty but for some wrongful act by the government.  Id.  The court in Barnick further held that the constructive service doctrine is not applied in instances where the plaintiff seeks to be "retained on active duty merely for disability evaluation."  Id.

At oral argument, counsel for Mr. Wollman asserted that Barnick does not apply because unlike the plaintiff in Barnick, who was a member of the Air Force reserves, Mr. Wollman was an active duty Captain at the time of his discharge.  In a recently decided case applying Barnick, this court rejected that application of Barnick turned on the status of the service member at the time of discharge.  Peterson v. United States, 104 Fed. Cl. 196, 206 (2012).  As the court noted in Peterson, "[s]everal factors, only one of which included the service member's status, informed the Barnick court's determination that the constructive service doctrine was inapplicable."  Id. at 207.   Among those factors were whether the member was arguing that, but for the wrongful act of the agency, he would have continued on active duty.  Id.  In this case, the government correctly points out that

Mr. Wollman has not alleged that he was fit for duty at the date of his discharge. Furthermore, the plaintiff's prayer for relief seeks "[r]estoration to active duty until such time as [the plaintiff's] physical disability case is finally decided . . ." Because the plaintiff fails to allege that he could remain on active duty after receipt of a proper disability evaluation, he cannot maintain a claim for back pay under 37 U.S.C. § 204 and this court may not grant his ancillary request to be restored to active duty. Rather, as the Federal Circuit explained in <u>Barnick</u>, if Mr. Wollman prevails his exclusive remedy will be for disability payments. <u>Id.</u> at 1380.

## III.   CONCLUSION

For the foregoing reasons, the government's motion for judgment upon the administrative record is **GRANTED-IN-PART AND DENIED-IN-PART**, and the plaintiff's cross-motion for judgment on the administrative record is **DENIED-IN-PART**. Pursuant to its authority under 28 U.S.C. § 1491(a)(2), this case is remanded for 90 days to the APDRB for further proceedings consistent with the order. The government shall provide the court with a copy of the decision on remand within 10 days of the decision. The plaintiff shall notify the court within 30 days after receipt of the APDRB's decision on remand as to whether he will accept or object to the APDRB's decision. If the APDRB requires additional time, the government should file a report setting forth the status of the APDRB proceeding at the conclusion of the 90 day period or, not later than **May 8, 2013**.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge